UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF TEXAS
DALLAS DIVISION

| | | |
|---|---|---|
| JOE ANN HAMILTON, ET AL., | ) | |
| | ) | |
| Plaintiffs, | ) | |
| | ) | CIVIL ACTION NO. |
| VS. | ) | |
| | ) | 3:07-CV-1442-G |
| FIRST AMERICAN TITLE INSURANCE | ) | |
| COMPANY, | ) | **ECF** |
| | ) | |
| Defendant. | ) | |

MEMORANDUM OPINION AND ORDER

Before the court is the motion of the plaintiffs Joe Ann Hamilton, *et al.* ("the plaintiffs") for class certification (docket entry 76).  For the reasons discussed below, the motion is granted.

I.  BACKGROUND

Each of the plaintiffs in this action purchased a title insurance policy from the defendant First American Title Insurance Company ("First American").  The plaintiffs claim that First American charged them unlawfully high premiums for their title-insurance policies.  They seek to recover damages from First American and to

represent a class of persons similarly situated who paid an unlawfully high premium

for title insurance policies issued by First American.

A.  Factual Background

1.  *Title Insurance*

Mortgage lenders in Texas require borrowers to purchase title-insurance

policies as a condition of making residential mortgage loans.  Plaintiffs' Memorandum

in Support of Motion for Class Certification ("Memorandum in Support") at 2.

There are two main kinds of title insurance: owner's title insurance and lender's title

insurance (also known as mortgagee title insurance).  *Id.*  An owner's title-insurance

policy protects the purchaser's clear title to the property.  Defendant's Memorandum

in Opposition to Plaintiffs' Motion for Class Certification ("Memorandum in

Opposition") at 3.  Homeowners typically purchase an owner's title-insurance policy

when they first acquire their property; the policy remains in effect for as long as the

homeowner owns the property.  *Id.*  In contrast, a lender's title-insurance policy

protects the lender's first-lien security interest in the property by insuring it against

the risk of undiscovered clouds on the title.  Memorandum in Support at 2.  Lenders

typically require the mortgagor to purchase a lender's title-insurance policy whenever

the lender is issuing a new loan; the policy remains in effect until the loan has been

fully repaid.  *Id.* at 2-3.

This case is about lender's title-insurance policies (hereinafter, "lender's policies") -- specifically, a type of lender's policy that is commonly referred to as a reissue policy.  Even though lender's policies are purchased for the lender's benefit, lenders usually require borrowers to pay the premium for the lender's policy, *id.* at 2, although this not invariably the case, *see* Memorandum in Opposition at 3 n.2. Lenders require a new lender's policy to be issued every time they make a first-lien residential mortgage loan.  Memorandum in Support at 2-3.  That means that borrowers purchase a lender's policy not only when they first acquire residential real property but also when they take out a mortgage to refinance residential real property that they already own.  *Id.*  A lender's policy that is issued simultaneously with an owner's title-insurance policy -- *i.e.*, that is issued in connection with the transaction in which a homeowner first acquires his or her property -- is commonly referred to as an "original-issue policy."  *See* Plaintiffs' Second Amended Complaint ("Complaint") at 4, ¶ 9.  A lender's policy that is issued in connection with a refinancing transaction is commonly referred to as a "reissue policy."  Memorandum in Support at 3.

## 2.  *Texas Law*

Pursuant to the Texas Insurance Code, the Texas Department of Insurance ("TDI") fixes the premium rates to be charged by title-insurance companies for lender's policies issued in Texas.  *Id.* at 3-4; *see also* TEX. INS. CODE § 2703.151. Texas is one of only three states that has promulgated specific, mandatory title-

insurance rates.  Memorandum in Opposition at 2-3.  Texas does not permit a title-insurance company to charge a premium for a lender's policy that is higher or lower than the premium rate fixed by state law.  Memorandum in Support at 4.  The TDI publishes the required rates in rate rules that appear in the Texas Title Manual.  Memorandum in Opposition at 2-3.

At issue in this case are the premiums charged by First American for certain types of reissue policies.  Rate Rule R-4 requires the premium on a reissue policy to be calculated using the Basic Rate.  *Id.* at 3; *see also* Texas Title Manual, Section III at 3, *located in* Appendix in Support of Defendant's Memorandum in Opposition to Plaintiffs' Motion for Class Certification ("Defendant's Appendix") at 51.  However, Rate Rule R-8 provides that the Basic Rate is to be discounted by a specified percentage if three requirements are met:  (1) the new loan that is being insured by the reissue policy must fully pay off an existing mortgage on the property; (2) the existing mortgage on the property must have been insured by a previous lender's policy; and (3) the refinancing transaction must take place less than seven years after the previous lender's policy was issued.  Memorandum in Support at 4; Memorandum in Opposition at 3-4; *see also* Texas Title Manual Section III at 6-7, *located in* Defendant's Appendix at 54-55.  The discount mandated by Rate Rule R-8 is commonly known as the "reissue discount."  Memorandum in Support at 4.  The highest available reissue discount is 40 percent, which is available for a refinancing

that takes place within 2 years of the issuance of the previous lender's policy.

Memorandum in Opposition at 4.  The available discount decreases by 5 percent per

year down to 15 percent for a refinancing that takes place more than 6 but less than 7

years after the issuance of the previous lender's policy.  *Id.*

### 3.  *The Plaintiffs' Claims*

The six plaintiffs refinanced the mortgages on their homes some time between

May 2006 and August 2007.  Memorandum in Support at 12-16.  The plaintiffs

obtained new mortgages in their refinancing transactions that fully satisfied the

existing mortgages on their homes.  *Id.*  Each of the existing mortgages that was fully

satisfied in these refinancing transactions was issued in favor of an institutional

lender.  *See* Complaint at 5-13; Memorandum in Support at 12-16.  As part of their

refinancing transactions, the plaintiffs purchased lender's policies insuring the

balances of their new mortgages.  Memorandum in Support at 12-16.  All of the

plaintiffs purchased lender's policies issued by First American.  *Id.*  All of the lender's

policies purchased by the plaintiffs were rated at the Basic Rate specified by Texas

Rate Rule R-4.  *Id.*  However, all of the existing mortgages that were fully satisfied in

the plaintiffs' refinancing transactions were less than seven year old.  *Id.*  As a result,

each of the plaintiffs contends that he or she was entitled to, but did not receive, a

reissue discount under Rate Rule R-8.  *Id.*

The plaintiffs allege four causes of action: money had and received; unjust

enrichment; violation of section 8(b) of the Real Estate Settlement Procedures Act

("RESPA"), *see* 12 U.S.C. § 2607(b); and breach of implied contract.  Complaint at

17-19.  They also seek to represent a class of persons situated similarly to themselves

who refinanced their homes in Texas; were charged a premium for a lender's policy

issued by First American when they refinanced their homes; and failed to receive the

mandatory reissue discount on that premium.[1]

## B.  Procedural Background

The plaintiffs move to certify this action as a class action under Federal Rule of

Civil Procedure 23(b)(3).  Memorandum in Support at 27.  Rule 23 provides that an

action may proceed as a class action only if all four prerequisites of Rule 23(a) and

the requirements of at least one of the three subsections of Rule 23(b) have been

satisfied.  See *Feder v. Electronic Data Systems Corporation*, 429 F.3d 125, 129 (5th Cir.

2005).  The party seeking class certification bears the burden of proving that all of

---

[1]    The plaintiffs seek certification of the following class:  "All persons who, within seven (7) years of the date of an existing mortgage on their residential real property in Texas, refinanced or otherwise replaced their existing mortgage and were charged a premium for a new lender title insurance policy underwritten by Defendant First American Title Insurance Company, and did not receive a refinance credit. . . .
      Excluded from the class are (1) First American Title Insurance Company and all directors, officers, agents and employees of First American Title Insurance Company; (2) Any person or entity who timely opts out of this proceeding; and (3) Any person who has given a valid release of the claims asserted in this suit.  The class includes borrowers who obtained new lender title insurance policies within four years prior to the filing of this action."  Memorandum in Support at 20 n.147.

the requirements of Rule 23 are satisfied.  *Gene and Gene LLC v. BioPay LLC*, 541

F.3d 318, 325 (5th Cir. 2008).

Rule 23(a) requires the party seeking class certification to demonstrate that:

> (1) the class is so numerous that joinder of all members is
> impracticable; (2) there are questions of law or fact
> common to the class; (3) the claims or defenses of the
> representative parties are typical of the claims or defenses
> of the class; and (4) the representative parties will fairly
> and adequately protect the interests of the class.

FED. R. CIV. P. 23(a)(1)-(4).  These requirements are commonly referred to as,

respectively, the requirements of numerosity, commonality, typicality, and adequacy

of representation.  See *Feder*, 429 F.3d at 129.

Rule 23(b)(3) imposes two additional requirements:  the court must find "that

the questions of law or fact common to class members predominate over any

questions affecting only individual members, and that a class action is superior to

other available methods for fairly and efficiently adjudicating the controversy."  FED.

R. CIV. P. 23(b)(3).  These requirements are commonly referred to as, respectively,

the requirements of predominance and superiority.  See *Gene and Gene*, 541 F.3d at

326.

Because of "the essentially factual basis of the certification inquiry and of the

district court's inherent power to manage and control pending litigation," a district

court "maintains substantial discretion in determining whether to certify a class

action."  *Allison v. Citgo Petroleum Corporation*, 151 F.3d 402, 408 (5th Cir. 1998).

The court must exercise that discretion within the framework of Rule 23. *Castano v. American Tobacco Company*, 84 F.3d 734, 740 (5th Cir. 1996). That framework requires a district court to undertake a "rigorous analysis" of the proposed class action to ensure that the requirements of Rule 23 are met. *Unger v. Amedisys Inc.*, 401 F.3d 316, 320-21 (5th Cir. 2005) (citing *General Telephone Company v. Falcon*, 457 U.S. 147, 161 (1982)). Although this rigorous analysis obligates the court to "conduct an intense factual investigation," *Robinson v. Texas Automobile Dealers Association*, 387 F.3d 416, 420 (5th Cir. 2004), *cert. denied*, 544 U.S. 949 (2005), and "take a close look at the parties' claims and evidence," *Unger*, 401 F.3d at 321 (citation and internal quotation marks omitted), "a preliminary inquiry into the merits" is inappropriate, *Castano*, 84 F.3d at 744. "In light of the fact that Rule 23 provides a district judge with great flexibility to adopt appropriate procedures, certify conditionally, or decertify a class in later stages of litigation, the Fifth Circuit has held that judges should err in favor of certification." *Bywaters v. United States*, 196 F.R.D. 458, 463 (E.D. Tex. 2000) (citing *Horton v. Goose Creek Independent School District*, 690 F.2d 470, 487 (5th Cir. 1982), *cert. denied*, 463 U.S. 1207 (1983)); see also *Kalodner v. Michaels Stores, Inc.*, 172 F.R.D. 200, 204 (N.D. Tex. 1997) (Kaplan, M.J.) ("In doubtful cases, judges should exercise their discretion in favor of certification.") (citing *Horton*, 690 F.2d at 487)).

## II. ANALYSIS

### A. Rule 23(a)(1):  Numerosity

The court finds that the plaintiffs' proposed class is so numerous that joinder of all members is impracticable.  To satisfy the numerosity requirement of Rule 23(a), a plaintiff must offer "some evidence or reasonable estimate of the number of purported class members."  *James v. City of Dallas*, 254 F.3d 551, 570 (5th Cir. 2001) (citation and internal quotation marks omitted), *cert. denied*, 534 U.S. 1113 (2002). In this case, the plaintiffs estimate that the class exceeds 50,000 members. Memorandum in Support at 23.  Their estimate is based on the number of policies issued during the proposed class period by First American at the Basic Rate under Rate Rule R-4.  *Id.*  The plaintiffs offer evidence that First American does not have a policy of auditing its agents to ensure the reissue discount is being given to customers who are entitled to it and argue that, as a result, a high percentage of policies issued under Rate Rule R-4 were likely entitled to the reissue discount.  *See* Memorandum in Support at 18 n.138.  "Although the number of members in a proposed class is not determinative of whether joinder is impracticable," the size of the plaintiffs' proposed class is comfortably "within the range that generally satisfies the numerosity requirement." See *Mullen v. Treasure Chest Casino, LLC*, 186 F.3d 620, 624 (5th Cir. 1999) (citations omitted), *cert. denied*, 528 U.S. 1159 (2000).

First American contends that the plaintiffs have not carried their burden on numerosity.  Specifically, First American argues that *Unger*, 401 F.3d at 319, requires the plaintiffs to provide admissible evidence of the number of people who were entitled to but did not receive the reissue discount during the class period.  Memorandum in Opposition at 33.  But *Unger* announced no such requirement.  It held only that plaintiffs seeking to certify a securities-fraud class action under a fraud-on-the-market theory are not entitled to a class-wide presumption of reliance unless they introduce admissible evidence that the security at issue is traded in an efficient market.  *Unger*, 401 F.3d at 325.  Outside of that specific context, "the lack of any direct evidence" of the number of class members is no bar to a finding of numerosity.  See *Mullen*, 186 F.3d at 625.  Here, even if the plaintiffs have overestimated the size of the class by 90 percent, the number of class members would still be too numerous for joinder to be practicable.  Therefore, the court finds that the plaintiffs have carried their burden of proving numerosity under Rule 23(a)(1).

### B. Rule 23(a)(2):  Commonality

The court also finds that there are questions of law and fact common to the class.  "The test for commonality is not demanding . . .." *Mullen*, 186 F.3d at 625.  Even though Rule 23(a)(2) speaks of common "questions," plural, the Fifth Circuit has held that "[a]ll that is required for each class is that there is one common question of law or fact." *James*, 254 F.3d at 570.  "The interests and claims of the

various plaintiffs need not be identical.  Rather, the commonality test is met when there is at least one issue whose resolution will affect all or a significant number of the putative class members." *Forbush v. J.C. Penney Company, Inc.*, 994 F.2d 1101, 1106 (5th Cir. 1993) (citation and internal quotation marks omitted).

Relevant Fifth Circuit precedent teaches that a question is common to the class if it generates a shared, class-wide answer.  See, *e.g.*, *Gene and Gene*, 541 F.3d at 328 (explaining that class-action plaintiffs must "propose a . . . class-wide means of establishing" the answer to common questions of fact and "advance a viable theory employing generalized proof to establish liability with respect to the class involved"). In other words, a common question is a question that only needs to be asked once of the class as a whole; once answered as to one class member, a common question is answered as to all class members.  See *Alabama v. Blue Bird Body Company, Inc.*, 573 F.2d 309, 320 (5th Cir. 1978) (concluding that "an issue common to the class" is one that is "subject to generalized proof," not one that is "unique to each class member").

In this case, the plaintiffs offer the following list of questions of fact or law that they propose are common to the class:

    1.    Whether the plaintiffs refinanced an existing mortgage within seven (7) years after the closing of the existing mortgage;

    2.    Whether the plaintiffs qualify for the mandatory reissue discount in connection with the reissue lender title policy;

3.      The dollar amount of the reissue discount required to be applied to the plaintiff's transaction;

4.      Whether defendant split the unearned discounts with its agents;

5.      Whether defendant's splitting of the unearned premiums with title agents violated Section 8(b) of RESPA;

6.      Whether defendant breached other legal duties to class members by failing to give them the discounted reissue premium rates mandated by Texas law and retaining those unearned premiums; and

7.      Whether plaintiffs are entitled to recover three times the amount charged to them for the reissue lender title insurance policies, pursuant to 12 U.S.C. § 2607(d)(2).

Memorandum in Support at 24.  Questions 1, 2, 3, and 4 are questions of fact, while questions 5, 6, and 7 are questions of law.

The court concludes that questions 5, 6, and 7 are questions of law that are common to the class.  As discussed more fully in the court's analysis of predominance under Rule 23(b)(3), see *infra* at 31-40, the factual variations that exist among the class members are immaterial to the resolution of these legal questions.  Each of these questions of law will generate a shared, class-wide answer and is thus a common question of law under Rule 23(a)(2).  Therefore, the court finds that plaintiffs' proposed class satisfies the commonality requirement of Rule 23(a)(2).  Even so, the

court will also consider whether any of the plaintiffs' proposed questions of fact are also common to the class because the commonality (or lack thereof) of those factual questions will be highly relevant to the court's analysis of predominance under Rule 23(b)(3).

The plaintiffs have not offered a definition of what it means for a question of fact to be "common" to the class. Their contention that the first four questions on their list are common questions of fact implies that a question of fact can be common to the class even if it does not generate a shared, class-wide answer. The plaintiffs' theory appears to be that a question of fact is common to the class if it is repeated across the class -- that is to say, it is a question that must asked of every class member. But such questions can only be answered as to each class member individually. And factual questions that generate multiple, class-member-specific answers are not "questions of . . . fact common to the class" within the meaning of Rule 23(a)(2). See, *e.g.*, *Bell Atlantic Corporation v. AT&T Corporation*, 339 F.3d 294, 302 (5th Cir. 2003) ("we have repeatedly held that where fact of damage cannot be established for every class member through proof common to the class, the need to establish antitrust liability for individual class members defeats Rule 23(b)(3) predominance.") (citations omitted); *Patterson v. Mobil Oil Corporation*, 241 F.3d 417, 419 (5th Cir. 2001) ("We have made [it] plain . . . that 'a fraud class action cannot be certified when individual reliance will be an issue.'") (quoting *Castano*, 84 F.3d at

745).  The fact that the "same battery of questions" will be asked repetitively "across a spectrum of thousands" of class members does not transform those questions into common questions of fact.  *Hancock v. Chicago Title Insurance Company*, 263 F.R.D. 383, 388 (N.D. Tex. 2009) (Fitzwater, C.J.); see also *id.* at 390 ("The mere fact that each plaintiff's claim involves the same list of questions does not transform those questions into common [questions].").[2]

The court concludes that, when judged against the correct legal standard for commonality, the plaintiffs have identified only one common question of fact: whether the existing mortgage on each plaintiff's property was insured by a prior lender's policy.[3]  At first blush, the question of whether each plaintiff's prior mortgage

_____

[2]       The plaintiffs' argument that questions that are repeated across the class are common questions appears to proceed from the premise that the need to determine liability on a class-member-by-class-member basis only defeats commonality where the individualized liability determinations are complex and subjective.  *See, e.g.*, Plaintiffs' Reply Memorandum in Further Support of Motion for Class Certification ("Reply") at 11 (contending that the age of each plaintiff's prior mortgage is a common question because it can be "easily answered from objective information in standard form documents" contained in each plaintiff's closing file).  The error of the plaintiffs' position is that it takes the standard for determining whether the need for individualized calculation of damages will defeat the predominance of a common liability question, see *infra* at 25-27, and applies it to the initial determination of whether the questions that establish liability are common to the class.  See *Hancock*, 263 F.R.D. at 390 ("The fact that each file likely contains similar documents is also insufficient to transform a case-by-case inquiry into class-wide proof.  For a question to be a common substantive issue that predominates, it must be definitively answered for all class members using a generalized set of facts and producing one unified conclusion.").

[3]       This question is contained within question 2 on the plaintiffs' list of

(continued...)

was insured by a prior lender's policy might look like a question that can only be

answered as to each class member individually.  However, the court concludes that it

is possible to answer this question on a class-wide basis.  The plaintiffs argue that the

presence of any one of the following three pieces of information in the closing file

generated during each class member's refinancing transaction is evidence that his or

her prior mortgage was insured by a lender's policy:  (1) a Guaranty File ("GF")

number; (2) an indication that the prior mortgage is returned to a title company; or

(3) information revealing that the prior mortgage was a first lien issued in favor of an

institutional lender (hereinafter, collectively, "the three proxy indicators").

Memorandum in Support at 5-7.  The plaintiffs have offered evidence in support of

their contention that the existence of a prior lender's policy can be inferred from the

presence of any one of the three proxy indicators in a class member's closing file.  *See*

*id.* at 5-7 nn.30-40; Reply at 5 nn.10-12.

---

[3](...continued)
proposed common questions, which asks "[w]hether the plaintiffs qualify for the
mandatory reissue discount in connection with the reissue lender title policy."  As
discussed above, see *supra* at 4, the plaintiffs qualify for the reissue discount if
(1) their refinancing transactions fully satisfied a prior mortgage; (2) the prior
mortgage was insured by a lender's policy; and (3) the lender's policy was less than
seven years old.  The third requirement is the subject of question 1 on the plaintiffs'
list of proposed common questions, while the first two requirements appear in
question 2.  Because there is no way to provide a single, class-wide answer to the
question of whether each plaintiff's refinanced mortgage fully satisfied the prior
mortgage on his or her property, the court concludes that this question is not a
common question of fact under Rule 23(a)(2).

First American vigorously disputes the plaintiffs' claim that the presence of one of the three proxy indicators in a class member's closing file is sufficient evidence from which a jury could infer that the class member's prior mortgage was insured by a prior lender's policy.  *See* Memorandum in Opposition at 20-23.  First American contends that only individualized evidence, such as the closing paperwork from a class member's previous mortgage, can prove the existence of a prior lender's policy.  See *id.* at 6.

The court concludes that the question of whether the existence of a prior lender's policy can be proven by one of the three proxy indicators is a common question of fact.[4]  The court is persuaded on this point by a recent decision in the Northern District of Texas in a factually similar case. See *Mims v. Stewart Title Guaranty Company*, 254 F.R.D. 482 (N.D. Tex. 2008) (Godbey, J.) ("*Mims II*"),[5] *rev'd*

---

[4]      As discussed below, see *infra* at 45-46, the court exercises its discretion to narrow the definition of the class so that it only includes persons whose closing files contain one of the three proxy indicators.  Therefore, there will be no need for individualized determinations of this issue at trial.

[5]      This order discusses three opinions that have issued in the *Mims v. Stewart Title Guaranty Company* case:  Judge Godbey's order denying Stewart Title's motion to dismiss, see *Mims v. Stewart Title Guaranty Company*, 521 F. Supp. 2d 568 (N.D. Tex. 2007); Judge Godbey's order granting the plaintiffs' motion for class certification, see *Mims*, 254 F.R.D. 482; and the Fifth Circuit's opinion affirming in part and reversing in part Judge Godbey's order certifying the class, see *Mims v. Stewart Title Guaranty Company*, 590 F.3d 298 (5th Cir. 2009).  The court will refer to these opinions, respectively, as *Mims I*, *Mims II*, and *Mims III*.

*in part on other grounds*, 590 F.3d 298 (5th Cir. 2009).  Addressing this same issue, the

court reasoned:

> According to Plaintiffs, establishing [that one of the three
> proxy indicators was present in a class member's closing
> file] is sufficient evidence for the jury to infer entitlement
> to the R-8 credit; [the defendant] claims the jury should
> not draw that inference.  Regardless [of] which side is
> correct as to the answer to that question, the question itself
> is a common question of fact.  Because the question itself is
> capable of classwide determination, the dispute over what
> determines R-8 eligibility does not itself weigh against class
> certification.

*Id*. at 487.  The Fifth Circuit subsequently affirmed this portion of *Mims II*.  See *Mims*

*III*, 590 F.3d at 308 ("We agree with the district court that establishing prerequisites

for class membership is sufficient evidence from which the jury could infer

entitlement to the R-8 credit, which [the defendant] is free to rebut.").[6]

_____

[6]      Several courts in other districts have considered class-certification
motions in cases challenging the premiums charged for lender's policies issued in
connection with refinancing transactions and reached the same conclusion, reasoning
that a defendant's challenge to the sufficiency of circumstantial evidence of a prior
lender's policy is properly raised at the merits stage.  See, *e.g.*, *Slapikas v. First American
Title Insurance Company*, 250 F.R.D. 232, 244 (W.D. Pa. 2008) (concluding that the
question of what "what constitutes evidence of a prior policy" under the Pennsylvania
rate manual "predominate[d] aross the entire class, and across each one of the class
claims" but was properly considered only "[a]t the merits stage") (internal quotation
marks omitted); *Alberton v. Commonwealth Land Title Insurance Company*, 247 F.R.D
469, 477 (E.D. Pa. 2008) (rejecting the defendant's argument that the class could not
be certified because the named plaintiff "presented no evidence of previous title
insurance" on the ground that "this argument is essentially another way of saying that
plaintiff's legal theory is wrong and that more evidence than the results of the title
search was needed to trigger a discounted rate," an argument the court characterized
as merits-based), *criticized on other grounds by Hunt v. United States Tobacco Company*,

(continued...)

First American offers two reasons why this court should reach a different conclusion.  First, it contends that the plaintiffs have conflated Rate Rule R-8's requirement of a prior mortgage with its requirement of a prior lender's policy.  *See, e.g.*, Memorandum in Opposition at 1; 21-22; 25.  According to First American, the plaintiffs "assert that the mere existence of a prior mortgage in the chain of title . . . is a proxy for the legal requirement of a prior title policy that would qualify a specific transaction for the R-8 credit."  Memorandum in Opposition at 21-22.  But First American's argument proceeds from a misconstruction of the plaintiffs' position.  The plaintiffs actually assert that the presence of either a GF number, a title-company stamp, or a prior institutional mortgage is a proxy for the legal requirement of a prior lender's policy.  *See, e.g.*, Reply at 4 ("The language of Rate Rule R-8 permits the

---

[6](...continued)
538 F.3d 217, 225 n.15 (3d Cir. 2008); *Dubin v. Security Union Title Insurance Company*, 832 N.E.2d 815, 819 (Ohio Ct. App. 2005) (reversing the lower court's holding that class certification was barred by the necessity for individualized inquiries into the existence of a prior lender's policy on the ground that the question of what kind of evidence of a prior lender's policy was required by Ohio's rate manual was a common question that went to the merits).

      A judge in this district recently denied a motion for class certification in a case in which the plaintiffs' list of proposed common questions was identical to the list offered by the plaintiffs in this case.  See *Hancock*, 263 F.R.D. at 384, 387-88.  Chief Judge Fitzwater based his decision in part on the fact that the named plaintiff had "not suggested how the court can separate a prior insured mortgage from one that was uninsured."  *Id.* at 391; see also *id.* at 386 ("circumstantial evidence that a prior mortgage was insured does not carry any legal weight.").  Because the plaintiffs in this case have suggested a class-wide basis for separating insured prior mortgages from uninsured prior mortgages, the court concludes that this case is distinguishable from *Hancock*.

inference that if a prior mortgage is from an institutional lender or other conditions

are present, the old mortgage is insured by a prior policy."). The plaintiffs' argument

is not incompatible with the dual requirements of Rate Rule R-8.[7]

---

[7]    First American contends that three recent decisions in factually similar cases demonstrate that the plaintiffs' position is untenable. See *Macula v. Lawyers Title Insurance Corporation*, __ F.R.D. __, 2009 WL 3754168 (N.D. Ohio Nov. 9, 2009); *Randleman v. Fidelity National Title Insurance Company*, __ F.R.D. __, 2009 WL 3012081 (N.D. Ohio Sept. 15, 2009); *Chesner v. Stewart Title Guaranty Company*, 2009 WL 585823 (N.D. Ohio Jan. 9, 2009). However, these cases are inapposite for two reasons. First, the plaintiffs in each case alleged that the defendant title company had violated Rule PR-10 of the Ohio Rate Manual. See *Macula*, 2009 WL 375418, at *1; *Randleman*, 2009 WL 3012081, at *1; *Chesner*, 2009 WL 585823, at *4. Ohio Rule PR-10 differs from Texas Rate Rule R-8 in a critical respect: it conditions the availability of the reissue discount on the "Insurer [being] given a copy of the prior [lender's] policy, or other information sufficient to identify such prior policy upon which reissue is requested." See, *e.g.*, *Chesner*, 2009 WL 585823, at *4. In each case, the court read Ohio Rule PR-10 as necessitating a determination of whether the insurer had been provided with sufficient information to identify a prior lender's policy at the time of each plaintiff's refinancing transaction and concluded that this determination was an individualized question of fact. See *Macula*, 2009 WL 375418, at *5; *Randleman*, 2009 WL 3012081, at *7; *Chesner*, 2009 WL 585823, at *8. In this case, no such determination is necessary. Texas Rate Rule R-8 only requires the existence of a prior lender's policy; it does not require the insurer to be provided with a copy of, or information about, that policy at the time the refinancing transaction takes place.

Second, the plaintiffs in the Ohio cases actually advanced the argument that First American inaccurately claims the plaintiffs are advancing here: that the existence of any prior mortgage in the chain of title was sufficient evidence of a prior lender's policy. See *Macula*, 2009 WL 375418, at *5; *Randleman*, 2009 WL 3012081, at *6; *Chesner*, 2009 WL 585823, at *1. In each case, the court concluded that the plaintiffs' argument would re-write the rule so as to eliminate the requirement of a prior policy. See, *e.g.*, *Chesner*, 2009 WL 585823, at *7 ("[T]he language of the Rate Manual simply cannot be read to exclude the requirement of an actual prior policy and substitute in its stead (as Plaintiffs would have it) the mere existence of a prior mortgage."). In this case, the plaintiffs have made a more refined argument: they have identified three specific pieces of information -- apart from the

(continued...)

Second, First American relies on the fact that the defendant in *Mims* had issued guidelines to its title agents instructing them to assume that a prior mortgage was insured by a lender's policy (and thus eligible for the reissue discount) if one of the three proxy indicators was present.  See *Mims II*, 254 F.R.D. at 484.  First American did not issue any such guidelines, and it claims that "*Mims* is immediately distinguishable" as a result.  Memorandum in Opposition at 32.  But the court is not persuaded that this factual distinction makes a legal difference.  The fact that the *Mims* defendant had issued guidelines to its title agents strengthened the plaintiffs' argument that it was reasonable to infer the existence of a prior lender's policy from the presence of one of the three proxy indicators.  The guidelines were a piece of circumstantial evidence.  Here, First American has not issued any guidelines to its agents, but the plaintiffs have offered other evidence that the presence of one of the three proxy indicators in a class member's closing file is circumstantial evidence of a prior lender's policy.  *See* Memorandum in Support at 5-7 nn.30-40; Reply at 5 nn.10-12.  It is possible that the absence of any First American-issued guidelines means the plaintiffs here have a weaker case than the plaintiffs had in *Mims*.  But that assessment is not the court's to make, and the certification stage is not the time to make it.  The question of whether the plaintiffs' evidence is sufficient to establish the

―――――――――――――

[7](...continued)
mere existence of a prior mortgage -- that they claim are circumstantial evidence of a prior lender's policy.  Therefore, the plaintiffs' position, unlike the position of the plaintiffs in the Ohio cases, does note elide the requirement of a prior lender's policy.

existence of a prior lender's policy is to be answered by a jury, and the time to answer

it is at trial.  Because that question is capable of being answered on class-wide basis,

the court concludes that it is a common question of fact within the meaning of Rule

23(a)(2).[8]

## C.  Rule 23(a)(3):  Typicality

In addition, the court finds that the claims of the named plaintiffs are typical

of the claims of the class.  First American does not claim that the plaintiffs' claims are

atypical, but the burden is on the plaintiffs to prove that the elements of Rule 23 are

satisfied, not on First American to prove that are not.  See *Unger*, 401 F.3d at 321

("The plain text of Rule 23 requires the court to 'find,' not merely assume, the facts

favoring class certification.").  "Like commonality, the test for typicality is not

demanding." *Mullen*, 186 F.3d at 625.  "If the claims arise from a similar course of

conduct and share the same legal theory, factual differences will not defeat

typicality." *James*, 254 F.3d at 571 (citation and internal quotation marks omitted).

---

[8]      The court acknowledges that "the legal requirements for eligibility for the R-8 credit are not identical to" the criteria the court is using to determine eligibility for membership in the class and that, as a result, "the class as defined may include plaintiffs who are not in fact eligible for the discount."  See *Mims III*, 590 F.3d at 307.  However, "[c]lass certification is not precluded simply because a class may include persons who have not been injured by the defendant's conduct."  *Id.* at 308 (citing *Kohen v. Pacific Investment Management Company, LLC*, 571 F.3d 672, 677 (7th Cir. 2009), *cert. denied*, __ U.S.__, __ S. Ct.__, 2010 WL 596881 (2010)).  If, as this action proceeds, it becomes apparent that the class is significantly overbroad, the court retains discretion to decertify the class.  See, *e.g.*, *Randleman*, 2009 WL 3012081, at *7 (granting a motion to decertify a class on the ground that "the class, as presently defined, is, for liability purposes, over-inclusive.").

In this case, the claims of the class representatives and of the putative class arise from a similar course of conduct, Memorandum in Support at 25, and share the same legal theories, *see* Complaint at 17-19.  Therefore, the court finds that the typicality requirement of Rule 23(a)(3) is satisfied.

### D.   Rule 23(a)(4):  Adequacy of Representation

The court also finds that the plaintiffs and their counsel will fairly and adequately protect the interests of the class.  "'Rule 23(a)'s adequacy requirement encompasses class representatives, their counsel, and the relationship between the two.'"  *Stirman v. Exxon Corporation*, 280 F.3d 554, 563 (5th Cir. 2002) (quoting *Berger v. Compaq Computer Corporation*, 257 F.3d 475, 479 (5th Cir. 2001)).  Rule 23(a)(4) is satisfied where:  (1) the named plaintiffs' counsel will prosecute the action zealously and competently; (2) the named plaintiffs possess a sufficient level of knowledge about the litigation to be capable of taking an active role in and exerting control over the prosecution of the litigation; and (3) there are no conflicts of interest between the named plaintiffs and the absent class members.  See *Feder*, 429 F.3d at 129-30 (citing *Berger*, 257 F.3d at 479-80); *Berger*, 257 F.3d at 482-83.

In this case, the plaintiffs have offered evidence, which First American does not dispute, that their counsel will zealously and competently prosecute this action.  *See* Memorandum in Support at 26-27 nn.182-87.  This evidence weighs strongly in favor of a finding of adequate representation under Rule 23(a)(4).  See *Gibb v. Delta*

*Drilling Company*, 104 F.R.D. 59, 75 (N.D. Tex. 1984) (Fish, J.) ("It is significant here that defendants have not challenged the competence of counsel for the proposed class. . . .  This is relevant because inquiries into the professional competence of their counsel inevitably merge into the broader issue of whether the representatives and their counsel *together* will sufficiently serve the interests of absent class members.") (emphasis in original).  The plaintiffs also allege that there is no reason to believe there is an antagonism or conflict of interest between the named plaintiffs and the absent class members, *see* Memorandum in Support at 26, and once again First American does not contend otherwise.

First American does contend, however, that the named plaintiffs are inadequate class representatives because they lack a sufficient level of "involvement in, control over, or understanding of this lawsuit."  Memorandum in Opposition at 36.  First American points to excerpts from each plaintiff's deposition as evidence that the plaintiffs have inadequate knowledge of this litigation to serve as class representatives.  *See* Memorandum in Opposition at 36-39.  First American also alleges that the plaintiffs Kimberly Williams-Thompson and Ernest Hamilton lied during their depositions.  *Id.* at 36-37.

Rule 23 does not judge the named plaintiffs' level of knowledge about the action against an exacting standard.  See *Rubenstein v. Collins*, 162 F.R.D. 534, 538 (S.D. Tex. 1995) ("Class representatives are merely asked to have a general

- 23 -

understanding of their position as plaintiffs with respect to the cause of action and

the alleged wrongdoing perpetrated against them by the defendants."). The named

plaintiffs "do need to know more than that they were involved in a bad business

deal," but they "need not be legal scholars and are entitled to rely on counsel." *Berger*,

257 F.3d at 483 (citation and internal quotation marks omitted).

The court concludes that five of the six plaintiffs are qualified to serve as class

representatives.[9] The deposition testimony of the plaintiffs Suzanna Brown, Ernest

and Joe Ann Hamilton, Carolyn Johnson, and Kimberly Williams-Thompson amply

demonstrates that each has an adequate layperson's understanding of the factual and

legal bases of this action. *See* Reply at 33-38 nn.149-92. The named plaintiffs in this

case may not be intimately familiar with the details of this litigation, but Rule 23

does not require them to be. See *Rubenstein*, 162 F.R.D. at 538 ("[T]he named

plaintiffs' lack of knowledge of . . . the conduct of the litigation is not relevant to the

question of the adequacy of the class representative.") (citation and internal

---

[9]     The court finds that the plaintiff Allean Brooks ("Brooks") is not able to
fairly and adequately represent the interests of the class. Brooks's deposition reveals
that she does not have a meaningful understanding of the factual and legal bases of
this action. *See generally* Deposition of Allean Brooks, *located in* Defendant's Appendix
at 324-330. Because the court finds that the remaining five plaintiffs can fairly and
adequately represent the interests of the class, Brooks's inability to do so does not
preclude a finding of adequacy of representation. This is especially true given that
Carolyn Johnson -- Brooks's daughter and fellow plaintiff in this action -- also
participated in the transaction in which Brooks refinanced her home, *see* Deposition
of Carolyn Johnson at 19-20, *located in* Defendant's Appendix at 312, and is thus
capable of acting on Brooks's behalf.

quotation marks omitted); cf. *Gibb*, 104 F.R.D. at 77 ("[T]he court is not required to find the 'best' representative, *i.e.*, the most vigorous or the most interested, but only one who will assert and protect the interests of the class.").  As to First American's allegations of dishonest testimony, the challenged portion of each plaintiff's testimony pertained to collateral, background matters that do not bear on the merits of this action.  In addition, the plaintiffs have explained that Kimberly Williamson-Thompson's inaccurate testimony was the result of a misunderstanding and that Ernest Hamilton's inaccurate response was the result of stroke-related memory loss rather than deliberate deception.  Reply at 38-39.  As a result, the court finds that the adequacy of representation requirement of Rule 23(a)(4) is satisfied.

### E.   Rule 23(b)(3):  Predominance

Turning to the first requirement of Rule 23(b)(3), the court finds that the questions of law and fact common to the class members predominate over any questions affecting only individual members of the class.  The court so finds based on its conclusions that(1) common questions of fact will predominate in the determination of whether the class members paid an unlawfully high premium for their lender's policies; (2) common questions law will predominate in the determination of whether plaintiffs are entitled to recover under RESPA § 8(b); and (3) common questions law will predominate in the determination of whether plaintiffs are entitled to recover under their three state-law claims.

The central task of the predominance inquiry is to consider "how a trial on the merits would be conducted if a class were certified." *Sandwich Chef of Texas, Inc. v. Reliance National Indemnity Insurance Company*, 319 F.3d 205, 218 (5th Cir.), *cert. denied*, 540 U.S. 819 (2003).  "This, in turn, entails identifying the substantive issues that will control the outcome, assessing which issues will predominate, and then determining whether the issues are common to the class, a process that ultimately prevents the class from degenerating into a series of individual trials." *Gene and Gene*, 541 F.3d at 326 (citation and internal quotation marks omitted).  As such, the predominance inquiry requires a thorough understanding and consideration of "the claims, defenses, relevant facts, and applicable substantive law." *Castano*, 84 F.3d at 744.  The predominance requirement is "reminiscent of the commonality requirement of Rule 23(a)," but it is "'far more demanding' because it 'tests whether proposed classes are sufficiently cohesive to warrant adjudication by representation.'" *Unger*, 401 F.3d at 320 (quoting *Amchem Products, Inc. v. Windsor*, 521 U.S. 591, 623-24 (1997)).

Because its ultimate concern is how the case "would actually be tried," *Castano*, 84 F.3d at 745, the predominance inquiry is context- and case-specific.  If many of the issues in a case are undisputed and "one substantive issue undoubtedly will determine how a trial on the merits will be conducted if the proposed class is certified," the disputed issue is the predominant issue in the action.  See *Gene and*

*Gene*, 541 F.3d at 327; see also *Amchem Products*, 521 U.S. at 623 ("[T]he predominance inquiry . . . trains on the legal or factual questions that qualify each class member's case as a genuine controversy . . .."). Similarly, if some questions are "relatively straightforward" while others are "vastly more complex," the more complex questions predominate. See *Steering Committee v. Exxon Mobil Corporation*, 461 F.3d 598, 603 (5th Cir. 2006).

Even where there are common issues of liability, issues of damages often remain individualized. "[T]he necessity of calculating damages on an individual basis will not necessarily preclude class certification." *Id.* at 602; see also *Bell Atlantic*, 339 F.3d at 306 ("[R]elatively few motions to certify a class fail because of disparities in the damages suffered by the class members."). If calculating damages is "virtually a mechanical task," *Blue Bird Body Company*, 573 F.2d at 326 (citation and internal quotation marks omitted), and "susceptible to a mathematical or formulaic calculation," *Bell Atlantic*, 339 F.3d at 307, then the individualized claims for damages will not predominate over the common liability issues. "[T]he need to calculate individual damages will defeat predominance" only where the damages are variable and "inherently individualized" such that "the issue of damages does not lend itself to mechanical calculation, but requires separate 'mini-trials' of an overwhelmingly large number of individual claims." *Id.* (citations, internal quotation marks, brackets and ellipsis omitted); see also *Steering Committee,* 461 F.3d at 602.

1.  *Establishing the Fact of Overpayment*

In this case, the court finds that common questions of fact would predominate at trial in determining whether the class members were charged unlawfully high premiums for lender's policies.  The Court agrees with First American that "[t]he primary substantive issue in this case is whether a given [lender's] policy issued by First American between 2003 and the present was entitled to, but did not receive, the R-8 reissue credit" and that the resolution of that issue depends on the answers to four subsidiary questions.  *See* Memorandum in Opposition at 18-19.  The court finds that common questions of fact will predominate in the resolution of the primary substantive issue at trial.

First, the trier of fact will have to determine "whether the [lender's] policy was issued to insure a mortgage that fully satisfied a prior mortgage."  Memorandum in Opposition at 18-19.  This question of fact is individualized, not common, but the plaintiffs have offered evidence that it can be definitively answered as to each class member using information contained in standard-form closing documents generated in connection with each class member's refinancing transaction.  *See* Reply at 9-10 nn.30-34.  If the mortgage originated in the refinancing transaction is a first-lien mortgage, then by definition the prior mortgage was fully satisfied; otherwise the new mortgage would be a second lien.  *See* Reply at 9.

Second, the trier of fact will have to determine "whether the prior mortgage being satisfied was insured by a [prior lender's] policy."  Memorandum in Opposition at 19.   As discussed above, this is a disputed question of fact that is common to the class and capable of being answered on a class-wide basis.

Third, the trier of fact will have to determine "the length of time between the date of the current policy and the prior [lender's] policy."  Memorandum in Opposition at 19.  Once again the plaintiffs have offered evidence that this question can easily be answered using information that invariably appears in each class member's closing file.  *See* Reply at 11 n.36.

Finally, the trier of fact will have to determine "who paid the premium for the current policy."  Memorandum in Opposition at 19.  This question, too, can be answered by reference to standard-form documents.  *See* Reply at 11 n.39.  In addition, the class as certified by the court is limited to "persons who . . . were charged a premium for" the lender's policy issued in connection with their refinancing transaction.  See *infra* at 45.  In light of the parameters established for class membership, any person whose lender's-policy premium was paid by the lender, *see* Memorandum in Opposition at 7, would not be included in the class.

After considering how a trial on the merits would proceed in this case, the court finds that common questions are likely to predominate over individual questions.  It is true that three of the four questions necessary to establish that the

class members paid too high a premium for their lender's policies are individual questions of fact.  However, each of these questions can be answered with information contained in documentary evidence.  It is probable that each of these questions will be answered as to all class members before a trial begins.  Where "all parties agree [on] the answer to [a] question," that question will not predominate at trial.  See *Hancock*, 263 F.R.D. at 389.  The only question of fact that  First American seriously contends cannot be answered using standard-form documents is the question of whether the class members' prior mortgages were insured by lender's policies.  *See* Memorandum in Opposition at 19-23.  As the only question that is likely to be in dispute at trial, this is the question that predominates in the action.  And the court has already determined that it is a common question of fact.

The court also concludes that the need for individualized damages calculations does not defeat predominance.  The plaintiffs have offered evidence -- which First American does not dispute -- that each class member's damages can be calculated using four pieces of information found in the standard-form documents contained in every class member's closing file.  *See* Memorandum in Support at 10-11 nn.72-74.  The spreadsheet of sample damage calculations presented by the plaintiffs, *see* Plaintiffs' Summary at 1, *located in* Appendix in Support of Plaintiffs' Memorandum in Support of Motion for Class Certification ("Plaintiffs' Appendix") at 522, demonstrates that the calculation of damages for each class member will be

mathematical, mechanical, and straightforward.  There will be no need for separate, individualized "mini-trials" on damages.  Therefore, individual damages questions will not predominate at trial.  Accord *Mims II*, 254 F.R.D. at 487-88.

First American protests that the "extraordinarily tedious, labor-intensive" process of conducting the file-by-file review needed to ascertain each class member's damages presents an insurmountable obstacle to class certification.  *See* Memorandum in Opposition at 21, 27.  The court does not agree.  "Although the task may prove to be a laborious one, this court is not persuaded that it is one that cannot be reasonably managed, and Plaintiffs plainly are willing to do the work."  *Mitchell-Tracey v. United General Title Insurance Company*, 237 F.R.D. 551, 560 (D. Md. 2006).  All of the variables that will give rise to differences in each class member's damages are identifiable on a classwide basis.  There will be no need for additional hearings or the gathering of individualized or subjective evidence.  Because the damages calculations are straightforward and mechanical, they will not require the kinds of individualized mini-trials that cause individualized damages issues to predominate over class-wide liability issues.

### 2.  *The RESPA Claims*

The court also finds that common questions predominate on the plaintiffs' RESPA claims.  RESPA § 8(b) provides, "No person shall give and no person shall accept any portion, split, or percentage of any charge made or received for the

rendering of a real estate settlement service in connection with a transaction involving a federally related mortgage loan other than for services actually performed."  12 U.S.C. § 2607(b).  Section 8(c) of RESPA clarifies that nothing in section 8(b) prohibits a title company from paying a fee to an agent "for services actually performed."  12 U.S.C. § 2607(c)(1)(B).  The Department of Housing and Urban Development (HUD), the agency charged by Congress with interpreting RESPA, "defines the § 8(c) exception in terms of a reasonable relationship test, holding that where 'the payment of a thing of value bears no reasonable relationship to the market value of the goods or services provided, then the excess is not for goods or services actually performed or provided.'"  *O'Sullivan v. Countrywide Home Loans, Inc.*, 319 F.3d 732, 739 (5th Cir. 2003) (quoting 24 C.F.R. § 3500.14(g)(2)).  Under HUD's interpretation of RESPA § 8(c), a single charge can be bifurcated into two fees, one that is reasonable in relation to the services performed and one that is not, and the second fee becomes a charge "other than for services actually performed" within the meaning of RESPA § 8(b).  The Fifth Circuit has held that HUD's interpretation of RESPA § 8(c) is "a broad agency rule" that is entitled to *Chevron* deference.  *Id.* at 740-41 (citing *Chevron U.S.A., Inc. v. Natural Resources Defense Council, Inc.*, 467 U.S. 837, 844 (1984)).

The plaintiffs argue that they can prove that First American is liable to them under RESPA § 8(b) by showing that (1) First American charged each of them a

premium for a lender's policy; (2) First American gave, and its title agents accepted, a

split of that premium; (3) the premium that First American charged each plaintiff

bore no reasonable relationship to the market value of the lender's policy; and

(4) neither First American nor its title agents actually performed any services in

exchange for the portion of the premium that exceeded the market value for a lender's

policy.  *See* Reply at 19-20.  The court will now consider whether any of these four

questions is an individualized factual or legal question that is likely to predominate at

trial over questions common to the class.

        The court easily concludes that the first three of these questions are not

individualized questions that are likely to predominate at trial over questions

common to the class.  The first question is an individualized question, but an

affirmative answer to it is a prerequisite for class membership; it will not be an issue

at trial.  The second question is a common question.  Texas law mandates that the

premiums paid for every lender's policy issued by an independent agent be split

between the agent and the title-insurance company.  Memorandum in Opposition at

3 (citing Texas Title Manual Section IV, P-23, *located in* Defendant's Appendix at 63-

64).  Whether First American also splits with its agents the premiums paid for title

policies issued through its direct operations is a common question of fact.  The third

question is a common question of law.  The plaintiffs's theory is that Rate Rule R-8

sets the market value for reissue policies in Texas.  Under this theory, "the title

insurance premium" paid by each plaintiff can be apportioned into two amounts: "the amount allowed under Rule R-8 after the appropriate discount is applied and the amount in excess of that amount."  See *Mims III*, 590 F.3d at 305.  According to the plaintiffs, the excess amount, as a matter of law, bears no reasonable relationship to the market value of a reissue policy and is thus a charge for which no services were actually performed.  *See* Reply at 18.  The particular amount by which any individual class member was overcharged is irrelevant to the plaintiffs' theory of liability.  The plaintiffs' theory hinges on a common question of law -- namely, the viability of HUD's interpretation of RESPA § 8(c).

The fourth question is a closer call, but the court concludes that it is also a common question of law.  Texas law requires all of the services First American actually performs in connection with the issuance of a lender's policy to be performed in exchange for the premium mandated by the governing rate rule.  *See* TEX. INS. CODE. § 2501.003(8).  Therefore, under HUD's interpretation of RESPA § 8(c), First American *could not* have actually performed any services in exchange for the portion of any premium that exceeded the amount mandated by the governing rate rule.  The plaintiffs argue that the same is true of the title agents who issued their policies.  Specifically, the plaintiffs contend that just as Texas law dictates the premium that a title underwriter can charge, Texas law also dictates the premium that a title agent can charge and that the title agents through whom First American issued the

plaintiffs' lender's policies were prohibited by law from accepting anything other than a split of the premium mandated by Rate Rule R-8 in exchange for the services they performed for the plaintiffs:

> As the plaintiffs put it, Texas law required the defendant *and its agent* to charge [the plaintiffs] a specific amount of money for its services.  Any money received in excess of that amount cannot possibly be reasonably related to services actually rendered.  In other words, the court finds that the reasonable relationship test is easily passed here.

*Hamilton v. First American Title Company*, 612 F. Supp. 2d 743, 749-50 (N.D. Tex. 2009) (Fish, J.) (citations to the record omitted) (emphasis added), *reporting* Memorandum Opinion and Order of April 21, 2009 (docket entry 96) at 14.[10]

The plaintiffs have thus articulated a theory of RESPA § 8(b) liability that can be adjudicated on a class-wide basis.  According to the plaintiffs, the fourth question necessary to establish liability under RESPA § 8(b) can be answered vis-a-vis the title agents by answering the following common question of law: whether Texas law limits the compensation available to a title agent for services performed in connection with

---

[10]    The plaintiffs' motion for class certification reiterates their theory that the premium mandated by Rate Rule R-8 was the entire fee that both the title agent and First American could collect for services actually performed in connection with the issuance of the plaintiffs' lender's policies.  *See* Memorandum in Support at 4. ("All services that relate to the title insurance policy must be provided for the mandatory premium and no additional amounts can be earned or collected."); *see also* Reply at 19 ("Here, all services provided by [First American] or its agent, regardless of variation by agent or transaction, must have been included for the mandatory fee -- net of the discount.").  The plaintiffs have also offered evidence in support of this claim.  *See* Memorandum in Support at 4 n.16.

the issuance of a lender's policy to a split of the premium received for the policy by

the title underwriter.  There is no need for individualized, factual inquires into the

services performed by the title agents in connection with each of the plaintiff's

refinancing transactions if title agents are obligated by law to perform all such services

in exchange for a split of the premium mandated by Rate Rule R-8.

The Fifth Circuit's decision in *Mims III* does not foreclose certification of the

plaintiffs' RESPA § 8(b) claims in this case.  In *Mims III*, the Fifth Circuit reversed

the district court's decision in *Mims II* to certify the plaintiffs' RESPA § 8(b) claims

because it concluded that the theory of RESPA liability articulated by the district

court in *Mims II* could not be adjudicated on a class-wide basis.  See *id.* at 304-07.  In

the district court's prior order denying the defendant's motion to dismiss, the district

court concluded that under HUD's theory of RESPA § 8(c), Texas law made it

impossible for a title underwriter to have actually performed services in exchange for

the excessive amount of a title-insurance premium.  See *Mims I,* 512 F. Supp. 2d at

572.  However, the court immediately noted that it was "not necessarily the case"

that the title agents also had not actually performed any services:  "The title agents

may have provided a service that warranted [the title underwriter] making the

payments to them."  *Id.*  The Fifth Circuit concluded that "the district court's theory

of liability under RESPA § 8(b) set forth in its ruling on the motion to dismiss . . .

requires an inquiry into the facts of each individual class member's title insurance

transaction." *Mims III*, 590 F.3d at 306.  The court's holding rested on its prior

decision in *O'Sullivan*.  See *id.* at 307 ("Under *O'Sullivan*, that inquiry [into the

reasonableness of the payments for goods and services] must be performed on a

transaction-by-transaction basis.").[11]  The court concluded that determining whether

the title agents' fees were reasonable in relation to the services they performed would

require an individualized, factual inquiry into the services performed for each class

member and that such an inquiry precluded common questions from predominating

under Rule 23(b)(3).  *Id.*

    The theory of RESPA § 8(b) liability articulated by the plaintiffs in this case

differs from the theory articulated in *Mims* and *O'Sullivan*.  In *O'Sullivan* there was no

fixed, mandatory fee the law firms were required to charge for document preparation;

a case-by-case inquiry was unavoidable.  And in *Mims* the plaintiffs did not argue that

title agents were barred by Texas law from accepting any compensation for services

actually performed in connection with the issuance of the plaintiffs' lender's policies

other than a split of the premium mandated by Rate Rule R-8.  In short, in both

---

[11]        In *O'Sullivan*, the Fifth Circuit decertified a class of plaintiffs who had
been charged document-preparation fees by law firms in connection with real-estate
closings.  319 F.3d at 735.  The law firms, in turn, rebated a portion of those fees to
Countrywide, the mortgage broker that was handling the closings.  *Id.* at 736.  The
plaintiffs argued that the law firms' rebates to Countrywide violated RESPA § 8(b)
because the rebates were not in exchange for services actually provided.  *Id.* at 737.
However, the Fifth Circuit concluded that Countrywide's employees did perform
some services related to document preparation and that only an inquiry "performed
on a transaction-by-transaction basis" could determine whether the amounts of the
rebates were reasonably related to those services.  *Id.* at 742.

*O'Sullivan* and *Mims* HUD's reasonable relationship test presented a question of fact. In this case the plaintiffs claim that it presents a question of law. That question can be answered on a uniform, class-wide basis. It is thus a common question of law, and the court finds that it is likely to predominate in this action.

By certifying the plaintiffs' RESPA § 8(b) claims for class treatment, the court intimates no view as to the merits of those claims. The court concludes only that the plaintiffs have carried their burden of demonstrating that questions common to the class will predominate over questions affecting only individual class members in the determination of whether First American is liable to the plaintiffs under RESPA § 8(b).

### 3. *The Three State-Law Claims*

In addition, the court finds that common issues of fact and law predominate under the plaintiffs' claims for unjust enrichment, money had and received, and breach of implied contract. There will be factual variations among the class members regarding the age, payoff balance, and original principal balance of their prior mortgages, but these variations will be material only to the question of damages. Because each class member participated in a structurally identical transaction, First American's liability to the class turns on common questions of law. See *Mims III*, 590 F.3d at 301(concluding that there were "no legal impediments to the certification of a class" on the three state-law claims presented here); see also *Alberton*, 247 F.R.D. at

479-80.  Would First American be unjustly enriched if it were allowed to retain

premiums shown to be unlawfully high?  Does the portion of the premium paid by

the plaintiffs to First American in excess of the amount mandated by Rate Rule R-8

belong to the plaintiffs in equity and good conscience?  Did First American breach an

implied contract between itself and each class member by charging too high a

premium?  Even though the plaintiffs' claims are equitable in nature, the fact that the

premium rate was fixed by law makes it unlikely that any individualized equitable

issues will emerge.  See *Mims III*, 590 F.3d at 308 (rejecting the argument that the

equitable nature of the plaintiffs' state-law claims necessitated an "individualized

factual inquiry" on the ground that "[g]ranting the R-8 to eligible borrower[s] is

mandatory"); see also  *Mitchell-Tracey*, 237 F.R.D. at 557 ("Although variations exist

as to the actual amount of the premium paid by each potential class member, these

variations do not alter the fundamental nature of the claims, as it is the nature of the

transactions, the rate charged, and the reasons therefor, that are in fact at issue in this

case.").

       First American's arguments to the contrary are unavailing.  First American

asserts that a breach-of-implied-contract claim requires an individualized

determination of the parties' intent.  Memorandum in Opposition at 29.  But the

determination of "[w]hether an implied contract exists . . . must be based upon

objective standards of the parties' actions, not on their alleged subjective states of

mind." *Ervin v. Mann Frankfort Stein & Lipp CPAs, L.L.P.*, 234 S.W.3d 172, 182-83 (Tex. App.--San Antonio 2007, no pet.).  See also *Alberton*, 247 F.R.D. at 479-80 (concluding that a breach-of-implied contract claim could be adjudicated on a class-wide basis) .  First American also contends that the claims for unjust enrichment and money had and received might be subject to the defense of voluntary payment. Memorandum in Opposition at 30.  However, in none of the cases on which First American relies was there a legally mandated maximum price for the goods or services at issue.  First American has not offered any evidence that the plaintiffs or other class members were aware that they were eligible for the reissue discount and voluntarily chose not to accept it, and "it is hard to believe that consumers would ever opt to pay a higher rate for the same policy." *Mims II*, 254 F.R.D. at 487.  Finally, First American argues that the need for individualized determinations as to the statute of limitations for each claim also precludes certification, Memorandum in Opposition at 31, but the applicable limitations period[12] is a question of law common to the class.

## F.  Rule 23(b)(3):  Superiority

Finally, the court also finds that a class action is superior to other available methods for fairly and efficiently adjudicating the controversy.  Rule 23(b)(3) contains a non-exclusive list of four factors pertinent to the superiority determination:

---

[12]      The relevant statutes of limitations are one year for the RESPA § 8(b) claim, two years for the unjust-enrichment and money-had-and-received claims, and four years for the breach-of-implied contract claim.  See *Mims II*, 254 F.R.D. at 488 (citing cases).

(A)  the class members' interests in individually controlling the prosecution or defense of separate actions;

(B)  the extent and nature of any litigation concerning the controversy already begun by or against class members;

(C)  the desirability or undesirability of concentrating the litigation of the claims in the particular forum; and

(D)  the likely difficulties in managing a class action.

FED. R. CIV. P. 23(b)(3)(A)-(D).  Neither the plaintiffs nor First American have alerted the court to any litigation begun by these plaintiffs or other class members in another forum, so the court finds that factor (B) is satisfied.  The court will consider the remaining factors in turn.

The court finds that the class members do not have a strong interest in individually controlling the prosecution of separate actions.  Where "the claims of the class members are virtually identical, no class member has a greater or lesser interest in controlling the action" than the named plaintiffs.  *Alberton*, 247 F.R.D. at 482 (citing *Cohen v. Chicago Title Insurance Company*, 242 F.R.D. 295, 300 (E.D. Pa. 2007)).  In addition, where each claim seeks a relatively small amount of damages, each class member's interests in individually controlling the action declines.  *Amchem Products*, 521 U.S. at 616-17.  Here, the alleged harms and claims are virtually identical across the class, and each class member's damages likely range from "a few hundred dollars or so to a few thousand dollars," Memorandum in Support at 33.  *See*

*also* Plaintiffs' Summary at 1, *located in* "Plaintiffs' Appendix" at 522 (showing damages ranging from $101.10 to $242.55 for each named plaintiff).

First American contends that the availability of treble damages and attorneys' fees under RESPA, *see* 12 U.S.C. §§ 2607(d)(2) & (d)(5), means that "'individual suits are feasible' and 'the most compelling rationale for finding superiority in a class action -- the existence of a negative value suit -- is missing . . ..'" Memorandum in Opposition at 40-41 (quoting *Castano*, 84 F.3d at 748). But *Castano* limited the applicability of the language quoted by First American to cases in which "each plaintiff may receive a large award" *and* "fee shifting is . . . available." See *Castano*, 84 F.3d at 748. Plus, the statute of limitations for a claim under RESPA § 8(b) is one year, *see* 12 U.S.C. § 2614, so only a portion of the class can pursue a RESPA § 8(b) claim. "[T]he chief purpose behind the class action device is to achieve a significant measure of judicial economy." *Allison*, 151 F.3d at 414. It would not serve the interests of judicial economy to require those class members with claims under RESPA § 8(b) to prosecute their claims separately from those class members who seek recovery under state law. Therefore, the court concludes that the class members' interests in individually controlling the prosecution of separate actions are low.

Next, the court finds that it is desirable to concentrate the claims in this forum. Doing so will help achieve "economies of time, effort, and expense, and promote uniformity of decision as to persons similarly situated." See *Amchem Products*, 521

U.S. at 615 (citation and ellipsis omitted).  First American objects to this court as a forum on the ground that the Texas Department of Insurance has exclusive jurisdiction over the plaintiffs' state-law claims.  *See* Memorandum in Opposition at 39-40.  This objection is unfounded.  See *Hancock v. Chicago Title Insurance Company*, 635 F. Supp. 2d 539, 554-59 (N.D. Tex. 2009) (Fitzwater, C.J.) (concluding, after an extensive analysis, that the Texas Title Insurance Act "does not contain an express indication of exclusive jurisdiction" and that "there is nothing in the regulatory scheme indicating that the Legislature intended for the TDI to have [exclusive jurisdiction]").

Finally, the court finds that the likely difficulties in managing this action as a class action are not so great as to render it unmanageable.  The manageability inquiry "encompasses the whole range of practical problems that may render the class action format inappropriate for a particular suit." *Eisen v. Carlisle & Jacquelin*, 417 U.S. 156, 164 (1974).  "[F]ailure to certify an action under Rule 23(b)(3) on the sole ground that it would be unmanageable is disfavored, and should be the exception rather than the rule." *In re Visa Check/MasterMoney Antitrust Litigation*, 280 F.3d 124, 140 (2d Cir. 2001) (Sotomayor, J.) (citations and internal quotation marks omitted), *cert. denied*, 536 U.S. 917 (2002), *abrogated by rule on other grounds as stated in Attenborough v. Construction and General Building Laborers' Local 79*, 238 F.R.D. 82, 93 (S.D.N.Y. 2006).

In this case, significant practical problems of manageability are unlikely to arise. The identities of the class members and the information needed to ascertain liability and damages are available in standard-form documents to which First American has access. First American maintains that it does not have access to all of the necessary documents because many of the class members' closing files are in the possession of independent agents. Memorandum in Opposition at 42-43. However, contractual obligations as well as regulations promulgated by the Texas Department of Insurance require these independent agents to maintain the relevant documents and provide copies of them to First American upon request. *See* Reply at 17 nn.66-67. See also *Mitchell-Tracey*, 237 F.R.D. at 560 ("It strains credulity to suggest, as Defendants do, that the Defendants (and their agents) lack the ability to compile information on insurance policies that they have issued, even if those policies have been issued by independent agents."). First American also contends that certifying this case as a class action would necessitate an unmanageably high volume of discovery and third-party discovery. Memorandum in Opposition at 42-43. But the mere fact that a class will be large in size is not a reason to deny certification. See, *e.g.*, *In re Visa Check/MasterMoney Antitrust Litigation*, 280 F.3d at 129-31 (affirming certification of a class action consisting of every business in the United States that accepted Visa and/or MasterCard credit cards). "Like other courts that have rejected arguments like defendant's, this Court concludes that the class will be manageable."

- 44 -

*Alberton*, 247 F.R.D. at 482 (granting a motion for class certification on very similar facts).[13]

F.  Rule 23(c)(1)(B):  Defining the Class
and Appointing Class Counsel

"An order that certifies a class action must define the class and the class claims, issues, or defenses, and must appoint class counsel under Rule 23(g)."  FED R. CIV. P. 23(c)(1)(B).  The court has discretion to "limit or modify" the plaintiffs' proposed definition of the class "to provide the necessary precision."  *In re Monumental Life Insurance*, 365 F.3d 408, 414 (5th Cir.), *cert. denied*, 543 U.S. 870 (2004). Accordingly, the court acts within its discretion to narrow the plaintiffs' proposed class definition and certifies the following class:

> All persons who, within seven years of the date of an existing mortgage on their residential real property in Texas, refinanced or otherwise replaced their existing mortgage; obtained, and were charged a premium for, a new lender's title-insurance policy underwritten by the defendant First American Title Insurance Company; did not receive a refinance credit; and whose existing mortgage

---

[13]     For additional examples of federal district courts and state trial courts granting motions for class certification in cases in which the plaintiffs alleged they were overcharged for title insurance in connection with a refinancing transaction, see *Markocki v. Old Republic National Title Insurance Company*, 254 F.R.D. 242, 250-52 (E.D. Pa. 2008); *Slapikas*, 250 F.R.D. at 251; *Woods v. Stewart Title Guaranty Company*, 2007 WL 2872219, at *2 (D. Md. Sept. 17, 2007); *Cohen*, 242 F.R.D. at 302; *Mitchell-Tracey*, 237 F.R.D. at 560; *In re Coordinated Title Insurance Cases*, 784 N.Y.S.2d 919, 2004 WL 690380, at *18 (N.Y. Sup. Ct. Jan. 8, 2004); *Mitchell v. Chicago Title Insurance Company*, 2003 WL 23786983, at *8-*9 (Minn. Dist. Ct. Dec. 22, 2003); see also *Dubin*, 832 N.E.2d at 820-21 (reversing, as an abuse of discretion, a trial court's order denying class certification).

> also (1) had a Guaranty File number, (2) was returned to a
> title company, or (3) was a first-lien mortgage in favor of
> an institutional lender.  The class is limited to all such
> persons who obtained new lender's title-insurance policies
> within four years of the filing of the complaint in this
> action and includes a subclass of persons who obtained
> new lender's title-insurance policies within one year of the
> filing of the complaint in this action.

Excluded from the class are (1) First American Title Insurance Company and all directors, officers, agents and employees of First American Title Insurance Company; (2) any person or entity who timely opts out of this proceeding; and (3) any person who has given a valid release of the claims asserted in this suit.

The class claims are for unjust enrichment, money had and received, and breach of implied contract, and the subclass has an additional claim for violation of RESPA § 8(b).

Based on its assessment of the factors enumerated in Rule 23(g)(1)(A)(i)-(iv) and Rule 23(g)(4), the court appoints Travis & Calhoun, P.C., and Barroway Topaz Kessler Meltzer & Check LLP as class co-counsel.

## III.  CONCLUSION

For the reasons discussed above, the plaintiffs' motion for class certification is **GRANTED**.

**SO ORDERED**.

March 29, 2010.


A. JOE FISH
**Senior United States District Judge**